# EXHIBIT A

Simon Bahne Paris
Patrick Howard
Joshua D. Snyder
Benjamin J. Eichel
**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3985
Facsimile: (215) 496-0999
Email: sparis@smbb.com
phoward@smbb.com
jsnyder@smbb.com
beichel@smbb.com

| | |
|---|---|
| RITA BOTELHO, DASHAWN PEYTON, and MICHAEL SHANAHAN, *individually on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br>v.<br><br>THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC,<br><br>Defendants. | Superior Court of New Jersey<br><br>Civil Division Hudson County<br><br>Docket No.___________<br><br>Civil Action<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Rita Botelho, DaShawn Petyon, and Michael Shanahan (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendants The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC (collectively, "Defendants"), and allege upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

**NATURE OF THE ACTION**

1. This is a class action lawsuit for violations of the New Jersey Consumer Fraud Act, violations of the New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act ("NJTCCA"), and breach of contract against Defendants arising out of unconscionable and unlawful rent leveling practices at apartment complexes located at 100 Warren Street, Jersey City, New Jersey ("100 Warren" or "Portside West") and 155 Washington Street, Jersey City, New Jersey ("155 Washington" or "Portside East") (collectively, the "Buildings").

2. At the heart of this case is a simple but powerful truth: Defendants have spent decades collecting rent overpayments from thousands of tenants in violation of Jersey City's Rent Control Ordinance, Jersey City, N.J. Code ch. 260-1 *et seq.* (the "Ordinance"), while hiding behind a claimed exemption that never legally existed.

3. Rent control ordinances in New Jersey serve multiple interconnected purposes rooted in the state's police power to protect public health, safety, and welfare. These ordinances aim to prevent excessive rent increases, stabilize rental markets, protect tenants from exploitation, and ensure the maintenance of adequate housing conditions while allowing landlords a just and reasonable return on their investments.

4. As detailed in this Complaint, Defendants' conduct has caused the very harms rent control was intended to foreclose. For example, one of the Plaintiffs named herein was left homeless after Defendants sharply escalated her rent over a period of years in violation of rent control laws and refused to negotiate any alternative. In another stunning example, Defendants forced a separate tenant out by increasing his rent by $600 per month in violation of rent control laws and, again, spurned all efforts to negotiate an alternative. There are literally dozens of similar examples of the consequences of Defendants' years-long illegal conduct.

5. The Buildings at issue have been subject to the Ordinance from the very beginning of their occupancy — a fact that the Jersey City Rent Leveling Board ("RLB") confirmed in a definitive October 2023 ruling that Defendants continue to ignore.

6. The statutory exemption Defendants have invoked for a generation — the New Jersey Newly Constructed Multiple Dwelling Act, N.J.S.A. 2A:42-84.1, *et seq*. (the "Act") — was enacted for one specific purpose: to encourage the construction of *new rental housing* by shielding developers of newly built rental apartment buildings from local rent control ordinances during a limited period, generally tied to mortgage amortization.

7. The Act was never intended to render an apartment building immune to local rent control laws indefinitely, but that's been Defendants' unlawful position, showing a callous disregard for their tenants' legal rights.

8. The Act was also never intended to apply to, and by its own terms cannot apply to, a project like Portside West — a building conceived, financed, approved, and constructed as a *condominium* development for sale, not as rental housing. The Act's goal of increasing the supply of rental housing has no application to a project that was never constructed to be rental housing at all.

9. Nor could the Act's exemption have lasted long even if it had applied. The Act caps the exemption period at the shorter of thirty (30) years or the amortization period of the initial mortgage.

10. The initial mortgage on Portside West — a $120 million loan from Citibank — carried an amortization period of just four (4) years. Any conceivable exemption window (even assuming one existed) for Portside West would have closed in 1992, before Defendants' predecessor had even begun renting units to the public.

11. For Portside East, given the applicable amortization period, even a generous reading of the Act would have produced an exemption lasting at most from 1998 to 2006. Yet Defendants continued to claim — and charge rents based on — a nonexistent indefinite exemption.

12. Putting aside the applicability of the exemption to the Buildings, Defendants failed to take the steps necessary to secure one in any event, as the New Jersey Legislature made clear that if an owner of a multiple dwelling intended to claim an exemption to the local rent control ordinances, they must meet two separate and distinct requirements.

13. *First*, the owner "*shall* file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy… a written statement of the owner's claim of exemption from a [rent control] ordinance under this [A]ct[.]" N.J.S.A. § 2A:42-84.4 (emphasis added). Defendants failed to comply with the Act's strict notice filing requirements, and therefore, even if the Buildings initially qualified for an exemption from the Ordinance, Defendants cannot now claim to have availed themselves of it.

14. *Second*, the owner "*shall*, prior to entering into any lease with a person of tenancy … furnish the prospective tenant with a written statement that the multiple dwelling … is exempt from rent control … for such time as may remain in the exemption period[.]" N.J.S.A. § 2A:42-84.3 (emphasis added). While Defendants provided a Rent Control Addendum to the Buildings' tenants, it was materially misleading. Defendants' written tenant statement affirmatively misrepresents New Jersey law and fails to disclose the Buildings' actual exemption period, as required.

15. On October 19, 2023, and memorialized in writing on November 3, 2023, the RLB ruled that both Buildings have always been subject to rent control. Notwithstanding the RLB's clear and unambiguous ruling, Defendants have continued to refuse to comply, imposing further

illegal rent increases on current tenants and failing to provide any remediation to the thousands of former and current tenants who have been overcharged. These practices have resulted in considerable financial hardships that too often result in tenants being forced out of the building, in some instances by eviction.

16. This lawsuit seeks to hold Defendants accountable for their years of unlawful conduct and to recover for Plaintiffs and the Class the substantial rent overcharges they have been forced to pay, as well as statutory penalties, interest, attorneys' fees and costs.

**PARTIES**

17. Plaintiff Rita Botelho is a former tenant of Portside East, who spent eighteen (18) years as a resident. Her first lease was in October 2004, and after multiple unlawful rent increases, she was forced out of her apartment and left homeless in July 2022. Rita Botelho was subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

18. Plaintiff DaShawn Peyton is a retired Navy veteran who currently resides in Portside East. Ms. Peyton moved into Portside in October 2020 and has faced rent increases as high as 42% in a single year. Ms. Peyton has been and is currently subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

19. Plaintiff Michael Shanahan is a senior citizen who is a tenant of Portside West. Since moving into the building in June 2001, Mr. Shanahan has moved internally at least twice during his time at Portside, with his most recent move to save money due to increased rent. Mr. Shanahan has been and is currently subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

20. Defendant The Towers at Portside Urban Renewal Company, LLC ("Portside") is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey. Portside is the owner of the Buildings.

21. Defendant Equity Residential Management, LLC ("Equity") is a limited liability company organized under the laws of Illinois, with its principal place of business in Chicago, Illinois. Equity serves as the management agent for Portside and manages the Buildings.

22. Defendants, individually and collectively, are responsible for the rental policies, practices, and decisions implemented at the Buildings, including but not limited to setting rental rates, enforcing lease terms, and ensuring compliance with applicable laws and regulations.

**JURISDICTION & VENUE**

23. This Court has jurisdiction over this action pursuant to the New Jersey Court Rules, as the claims arise under the laws of the State of New Jersey.

24. Venue is proper in this Court pursuant to N.J. Court Rule 4:3-2, as Defendants conduct business in this county, and a substantial part of the events or omissions giving rise to the claims occurred in this county.

25. Plaintiffs and Class Members are or were residents of New Jersey. Plaintiffs Peyton and Shanahan and many Class Members are current residents of New Jersey, and Defendants have sufficient minimum contacts with New Jersey to subject them to the personal jurisdiction of this Court.

26. Defendants have purposefully availed themselves of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of its laws.

27. The claims asserted herein arise out of Defendants' conduct within the State of New Jersey, making the exercise of jurisdiction by this Court proper and just.

28. All of Plaintiffs' leases contain language in Paragraph 35, providing that the "Lease shall be governed by the laws of the state in which the Community is located, and all legal action arising from this Lease shall be tried in the county where the Community is located." The provision

is captured below:

> **35. Laws Governing this Lease/Venue:** This Lease shall be governed by the laws of the state in which the Community is located, and all legal action arising from this Lease shall be tried in the county where the Community is located.

29. Because the Community is located in New Jersey, New Jersey law applies to this dispute.

30. Because the Community is located in Hudson County, New Jersey, this action must be brought in this Court. *See Wall St. Aubrey Golf, LLC v. Aubrey*, 189 F. App'x 82 (3d Cir. 2006); *Integrated Health Res., LLC v. Rossi Psychological Grp., P.A.*, 537 F. Supp. 2d 672, 673 (D.N.J. 2008)

31. The Court has personal jurisdiction over Portside as it is an entity that is organized and existing under the laws of the State of New Jersey, maintains its principal place of business in New Jersey, and regularly transacts business in New Jersey. Similarly, the Court has personal jurisdiction over Equity Residential as it routinely, and regularly, enters into contracts in Hudson County and as such availed itself of this Court's jurisdiction.

32. Plaintiffs' causes of action arise out of Defendants' conduct in the State of New Jersey.

## FACTS

### I. Background on New Jersey Rent Control Law

#### A. Jersey City's Rent Control Ordinance

33. New Jersey municipalities have authority to enact rent control ordinances pursuant to their general police powers under state law. *See Inganamort v. Borough of Fort Lee*, 303 A.2d 298, 306 (N.J. 1973).

34. N.J. Stat. Ann. § 40:48-2 grants municipalities broad authority to "make, amend,

repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of [New Jersey] or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants."

35. The New Jersey Constitution further provides that provisions concerning municipal corporations "shall be liberally construed in their favor" and that municipal powers "include not only those granted in express terms but also those of necessary or fair implication." N.J.S.A. Const. Art. 4, § 7, ¶ 11.

36. Although rent control ordinances were initially enacted in response to depressed financial conditions, by 1986 the New Jersey Supreme Court had concluded that "[r]ent control is no longer predicated upon a housing emergency. It may be regarded as a form of governmental regulation in the public interest." *Mayes v. Jackson Twp. Rent Leveling Board*, 511 A.2d 589, 597 (N.J. 1986) (internal quotations and citations omitted).

37. On or about February 7, 1986, the City adopted its Rent Control Ordinance, Jersey City, N.J., Code ch. 260-1 *et seq*.

38. The Ordinance applies to residential rental properties with 5 or more units. Jersey City, N.J., Code ch. 260-1.

39. If a dwelling is subject to the Ordinance, the owner of the dwelling must follow the Ordinance's restrictions on "allowable" rent increases.

40. The Ordinance (ch. 260-3) generally prohibits rent increases in excess of four (4) percent on an annual basis.

**B. The Statutory Exception to Jersey City's Rent Control Ordinance**

41. In 1987, the New Jersey Legislature enacted P.L. 1987, c. 153 (codified N.J.S.A.

§ 2A:42-84.1) to establish an experimental program exempting newly constructed multiple dwellings from local rent control ordinances.

42. The stated legislative intent was "to establish an experimental program whereby the construction of multiple dwellings in this State shall be encouraged, and the marketability of those multiple dwellings shall be maintained, to the greatest extent economically possible, through the exemption by law of newly constructed multiple dwellings from rent control, rent leveling and rent stabilization ordinances." N.J.S.A. 2A:42-84.6 ("Public policy; experimental program to encourage construction and maintain marketability of multiple dwellings").

43. The Act permits developers of new construction projects to apply for exemptions from municipal rent control ordinances such as the Ordinance, provided they comply with explicit and strict eligibility requirements.

44. The Act provides that certain buildings constructed after 1987 can be exempted from local rent control ordinances "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less." N.J.S.A. 2A:42-84.2.

45. The Act also provides that owners claiming an exemption must file a written statement of their claim of exemption with the municipal construction official at least 30 days before the building's initial certificate of occupancy is issued. *See* N.J.S.A. 2A:42-84.4.

46. Owners exempted under the Act are required to provide tenants entering into leases with a written statement on the applicable exemption status as well as the duration of the exemption, prior to tenants entering into leases in the affected units. N.J.S.A. 2A:42-84.3.

47. Section 84.6 of the Act explains that the exemption's purpose was to make these newly constructed buildings exempt from local rent control ordinances "*during the period of*

*exemption afforded*, in order to maintain in this respect a predictable environment within which the financing, construction and marketing of new multiple dwellings can occur." N.J.S.A. 2A:42-84.3 (emphasis added).

48. Section 84.5(b) further explained that the purpose of the Act was to "increase the supply of *newly constructed rental housing* to meet the need for such housing in New Jersey." N.J.S.A. 2A:42-84.5(b) (emphasis added). The Act attempted to increase this supply by promoting new construction of rental housing by "exempt[ing] new construction of rental multiple dwelling units from municipal rent control so that the municipal rent control or rent leveling ordinance would not deter the new construction." *Id.*

49. By 1997, the New Jersey Legislature amended P.L. 1987, c. 153, making what was only temporary legislation into permanent law, P.L. 1997, c. 56.

50. In 1999, the New Jersey Legislature acted again, this time to clarify that buildings financed without traditional mortgages (e.g., Real Estate Investment Trusts and other public companies) would be subject to N.J.S.A. § 2A:42-84.2's 30-year exemption, with the Act's legislative history expressly contemplating as a pre-condition of that exemption: "the owner of the multiple dwellings has fully complied with the requirements of section 4 of P.L., c. 15 (C.2A:42-84.4)" providing notice of the claimed exemption.

## II. History of the Buildings

51. The Buildings are located on Block 60, Lot 34 on the tax map of the City of Jersey City (hereinafter the "Property").

### A. <u>Portside West</u>

52. By deed dated September 20, 1988, Waterview Associates, a New Jersey general partnership transferred the Property to DeMatteis/Waterview Associates, a New Jersey general partnership, for One Million Dollars ($1,000,000.00).

53. DeMatteis/Waterview Associates intended to develop the Property into a condominium project.

54. As part of that plan, on September 27, 1988, DeMatteis/Waterview Associates entered into a mortgage and mortgage note on the Property with Citibank, N.A. for One Hundred Twenty Million Dollars ($120,000,000.00). The amortization period of this Citibank mortgage was four (4) years.

55. In 1989, the Office of the Construction Official for Jersey City ("Construction Official") issued building permit number 89-0504 to DeMatteis/Waterview Associates for the construction of Portside West.

56. DeMatteis/Waterview Associates took out the loan and obtained all approvals to build condominiums for sale.

57. On August 25, 1992, the Construction Official issued a Certificate of Occupancy for Portside West ("West CO").

58. Following the completion of construction and the issuance of the West CO, DeMatteis/Waterview Associates defaulted on its mortgage with Citibank.

59. In June of 1994, two years after completion of construction, Citibank and Jersey City agreed that Portside West, originally constructed as a condominium project, would be used for rental apartments.

60. Following a foreclosure on the Property by Citibank, on November 23, 1994, the Hudson County Sheriff issued a Sheriff's Deed transferring the Property to Portside Apartments Urban Renewal Partners, LP.

61. By letter dated November 23, 1994, nearly two years and two months after the issuance of the West CO for Portside West, Portside Apartments Urban Renewal Partners, LP sent

a letter to the Construction Official stating that pursuant to N.J.S.A. § 2A:42-84.4, Portside Apartments Urban Renewal Partners, LP considered Portside West to be exempt from the Ordinance.

62. On December 6, 1994, the Jersey City Construction Official responded, acknowledging receipt, but stating that "the Office of Construction Official has no jurisdiction over rent controls, and I would suggest that you contact the proper agency charged with that responsibility."

63. On January 24, 1995, the Construction Official issued a Certificate of Continued Occupancy for Portside West. This document differs significantly from a Certificate of Occupancy. A Certificate of Continued Occupancy is issued for an already constructed building, not for new construction as stipulated by N.J.S.A. 2A:42-84.1.

64. Upon information and belief, at some point after acquiring title to the Property on November 23, 1994, but prior to 1996, Portside Apartments Urban Renewal Partners, LP changed the ownership entity of the Property to Portside Apartments Urban Renewal Company, L.L.C., without recording a deed for such change in ownership.

**B. <u>Portside East</u>**

65. On or about July 18, 1996, Portside Apartments Urban Renewal Company, LLC entered into a mortgage on the Property with Fleet Bank, N.A. for Sixteen Million Five Hundred Thousand Dollars ($16,500,000.00) ("Fleet Mortgage").

66. On the same day, July 18, 1996, Portside Apartments Urban Renewal Company, LLC, entered into a mortgage on the Property with The Northwest Mutual Life Insurance Company for Twenty-two Million Five Hundred Thousand Dollars ($22,500,000.00) ("Northwestern Mutual Mortgage").

67. Both the Fleet Mortgage and the Northwestern Mutual Mortgage had an amortization period ending in July of 2006.

68. In July of 1996, Portside Apartments Urban Renewal Company, LLC began construction of Portside East, the second of the Buildings.

69. The Certificate of Occupancy for Portside East was issued on December 31, 1997 ("East CO"). There is no evidence that the owner of Portside East filed with the municipal construction official, at least 30 days prior to the issuance of the certificate of occupancy a written statement of the owner's claim of exemption from rent control pursuant to N.J.S.A. § 2A:42-84.4.

70. On or about June 10, 1998, both the Fleet Bank Mortgage and the Northwestern Mutual Mortgage were satisfied and discharged.

71. Thereafter, by deed dated June 11, 1998, Portside Apartments Urban Renewal Company, LLC transferred the Property for One Hundred Dollars ($100.00) to the current owner, Portside.

## III. The RLB Determines that the Buildings are Not Exempt from Jersey City's Rent Control Laws

72. Beginning in 2022, and in response to inordinate rent increases, the Buildings' tenants submitted Illegal Rent Petitions to the Jersey City Office of Landlord/Tenant Relations Bureau of Rent Leveling.

73. Pursuant to Chapter 260-7(G) of the Ordinance these petitions were submitted on behalf of all other tenants. Tenants of Portside East filed their petitions on or about May 31, 2022, and tenants of Portside West filed their petitions on or about June 25, 2022.

74. Through their filings, the tenants claimed their landlord was illegally raising their rents. Defendants subsequently filed oppositions to the illegal rent petitions.

75. Thereafter, on or around September 19, 2022, the Rent Leveling Administrator

("RLA") issued a determination that Portside West was not subject to the Ordinance until August 24, 2022, and that "[g]oing forward, [Portside West] is subject to the rent restrictions of the Ordinance."

76. The RLA concluded that Portside East "has been and remains exempt" from the Ordinance through December 30, 2027.

77. The tenants that filed the Illegal Rent Petitions appealed the September 19 decisions to the RLB.

78. The RLB consolidated both matters and held a hearing on May 31, 2023, where it heard arguments from the parties.

79. The RLB convened on October 19, 2023, and issued its written decision on November 3, 2023 (attached as Exhibit 1), declaring that the original property owners of the Buildings failed to comply with the requirements of the Act, concluding that the Buildings had always been subject to rent control, were not exempt, and that the Buildings were in violation of applicable law.

80. The RLB found that neither of the Buildings had ever been exempt from the Ordinance because the owners failed to comply with the Act's notice requirements. *See* N.J.S.A. 2A:42-84.4.

81. As to Portside West, the RLB found that the owner could not have "timely avail[ed] itself of the exemption because the letter that the owner sent claiming the exemption was not filed before the certificate of occupancy for the new construction at 100 Warren in 1992." Ex. 1 at 7.

82. Moreover, as recognized by the RLB, DeMatteis/Waterview built Portside West for the contemplated sale of condominium units, not apartment rentals, which makes it beyond the scope of the Act. *See* N.J.S.A. 2A:42-84.5; Ex. 1 at 3. As a result, there never was any basis for

Portside West to be exempt from the Ordinance under the Act.[1]

83. The statutory text and legislative history of the Act make clear that this finding is not a technicality — it is fatal to any claim of exemption.

84. The Act was explicitly designed to "increase the supply of newly constructed *rental* housing to meet the need for such housing in New Jersey." N.J.S.A. 2A:42-84.5(b) (emphasis added).

85. It accomplishes this by exempting new construction of *rental* multiple dwelling units from municipal rent control "so that the municipal rent control or rent leveling ordinance would not deter the new construction." *Id.* The mechanism is straightforward: absent rent control, developers can charge market rents during the mortgage amortization period, making financing and development more economically viable and predictable.

86. Portside West was never part of this calculus. DeMatteis/Waterview Associates obtained its construction loan, its building permits, and all of its governmental approvals for the purpose of building *condominiums for sale* — not rental apartments. No amount of subsequent financing changes the character of the project at the time of its conception and construction.

87. When the building's original developer defaulted on its mortgage and Citibank foreclosed, the property did not retroactively transform into a rental housing project that the legislature intended to incentivize. The Act's exemption is not a windfall available to any new building that happens to be later repurposed for rentals; it is a carefully targeted incentive tied to the original development of rental housing.

88. The Ordinance, by contrast, applies broadly to all residential *rental* properties with

[1] The RLB did not address issues relating to the Properties' mortgages because it concluded that Defendants failed to establish that they complied with the Act's notice requirements as a threshold issue. Ex. 1 at 8.

five or more units, without regard to how or why those units were originally built. Once Portside West was converted to a rental building in 1994 — two years after construction was complete and years after it defaulted on its original mortgage — it became subject to the Ordinance by operation of law, without any applicable exemption.

89. Additionally, the Act only provides an exemption "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, *whichever is less*." (emphasis added). The initial mortgage obtained for Portside West had an amortization period of four years, meaning that to the extent Portside West was ever potentially eligible for exemption under the Act, that was during a limited window that closed in 1992.

90. Under the Act's own terms, any exemption would have been measured from the date of mortgage origination — meaning the outside limit of any exemption was 1992, coinciding with or predating the issuance of the West CO itself.

91. Even accepting the most favorable possible reading of the timeline, the window within which Portside West *could* have been exempt closed before the building was ever rented to a single tenant.

92. With a four-year amortization period, the Citibank mortgage was fully amortized by 1992. The Act's protective window closed at that moment. When Portside Apartments Urban Renewal Partners, LP attempted in November 1994 — more than two years after the Certificate of Occupancy was issued — to claim an exemption under the Act, the Act's own durational limit had already run. There was nothing left to claim.

93. As to Portside East, the record is clear that the then owner (Portside Apartments Urban Renewal Company, LLC) never filed the notice required by Section 84.4 before or after the

issuance of the certificate of occupancy was issued.

94. The RLB held that the property owner was "clearly aware" of the requirement to file an exemption letter prior to the issuance of a certificate of occupancy, which is a "mandatory condition precedent" and "[t]here is no dispute that as it relates to [Portside East] that the record is devoid of any evidence of compliance with the notice requirement." Ex. 1 at 8.

95. Additionally, even if Portside Apartments Urban Renewal Company, LLC, had provided the statutorily required notice under Section 84.4, Portside East would only have been exempt from the Ordinance for a very limited period of time. This is because in 1996, Portside Apartments Urban Renewal Company, LLC took out mortgages on the Property with Fleet Bank, N.A. and Northwestern Mutual Mortgage for a total amount of $39,000,000, which were presumably to be used for constructing Portside East.

96. Both the Fleet Bank and Northwestern Mutual mortgages had amortization periods ending in July of 2006 and Portside Apartments Urban Renewal Company, LLC paid off both mortgages by June 1998.

97. Accordingly, even if Portside East had complied with the Act's notice requirements, it would have only been exempt from the Ordinance from 1998-2006. *See* N.J.S.A. § 2A:42-84 (the exemption shall apply "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.").

98. In concluding its analysis of this issue, the RLB stated that "[w]ith only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at [Portside East] are not exempt from the City's rent control ordinance."

Ex. 1 at 8.

99. The RLB thus concluded that "due to the failure by the Property Owner and its predecessor to comply with the notice requirement in N.J.S.A. § 2A:42-84.4, both buildings and all units therein are and have been for the duration of their occupancies subject to rent control." *See id.* at p. 10 (emphasis added). Significantly, the RLB held that there was no valid exemption from the beginning of the occupancy of the units. *See id.*

100. Despite the RLB's clear and unambiguous ruling, Defendants have continued to violate the Act and Ordinance and disregard the rights of the tenants by leveling rents in excess of the applicable rent control rate.

## IV. Defendants Imposed Significant and Illegal Rent Increases on Plaintiffs and the Class

101. During a Jersey City Municipal Council Meeting, residents of the Buildings spoke to address their concerns that Defendants had improperly increased rents in violation of the applicable rent control laws.

102. Plaintiff Michael Shanahan spoke at that meeting. He has lived at Portside for over 20 years. He explained that in recent years, Portside has only offered him the option of one-year lease terms and that he would receive notice of his new lease every year on Christmas Eve. https://youtu.be/1BjamxIGRFE?si=gH_fyoEPu4cTg28p&t=3672.

103. On Christmas Eve of 2019, he received his lease and realized it was for more than he could afford and asked to switch to a lower priced apartment so that he could save $850 per month. *Id.*

104. The following Christmas Eve, he received notice that the rent on his new apartment would be going up 10%. Equity refused to meet with Mr. Shanahan to discuss the proposed increase and refused to negotiate the proposed increase, forcing Mr. Shanahan to consider moving

from his long-term home. *Id.*

105. Plaintiff Rita Botelho also spoke at the meeting and explained that she moved into Portside in 2004 and since then has faced annual rent increases. In 2020, the rent for her three-bedroom apartment, which she shared with her husband and a roommate increased to $4,775, which they could not afford. https://youtu.be/550TjTqCcoY?si=fg1IomaLc1Dsn_tj&t=7055.

106. Because of this increase, Ms. Botelho decided to downgrade to a two-bedroom apartment in 2020 for $3,598 per month. Within approximately two years of moving to the smaller apartment, Defendants increased her rent to $4,685, nearly the amount she would have been paying for a three-bedroom apartment only a year before. *Id.*

107. In 2021, Ms. Botelho was laid off because of the COVID-19 epidemic. Despite her job loss, she remained in her apartment and continued paying rent out of her savings. *Id.*

108. In April 2022, she received notice of a 25% rental increase and Defendants refused to negotiate the increase. *Id.*

109. Ms. Botelho had no option but to put her belongings into storage and Ms. Botelho and her husband were left homeless and were forced to live in the living room area of a relative's apartment. *Id.*

110. Tahera Hamdani, also spoke at the meeting. She is a single mother and experienced recurring problems with rats and mice in her unit that required "40 plus" visits from exterminators to address the problem, but those efforts were ultimately unsuccessful, requiring her to move to another unit in the Building. https://youtu.be/xiG3gsIS35E?si=SfGr4coK3m8XbY-Z&t=6588

111. In the midst of these problems, her unit came up for renewal and Defendants increased her rent by more than 30%. Due to the pest issues, she withheld rent while Defendants actively worked to remediate the problem. Unbeknownst to Ms. Hamdani, Defendants

simultaneously took actions to evict her from her home, eventually serving a notice of eviction and a demand that she pay for Defendants' attorneys.

112. Defendants only relented and withdrew the notice of eviction and demand for attorney's fees when Ms. Hamdani went through the trouble and expense of retaining her own attorney to protect her rights.

113. As another example of Defendants' acts of corporate bullying, Santkitha Subramanian, a former resident, explained that during her tenancy in 2022, Equity gave her the option of a 12-month lease for $4,800 per month or a month-to-month lease for $6,200 per month. https://youtu.be/mE717wBnx-8?si=iOn7uo4h0FaTGA9k&t=4183

114. Faced with these exorbitant rents, Ms. Subramanian had no choice but to leave her home after four years. Even though she gave notice in early August of her intent to vacate the apartment by mid-September (more than the required 30-day notice), Defendants required her to pay a month of the increased rent and when she refused, Defendants sent the amount to collections, threatening her credit rating.

115. In one other example, a former tenant of Portside West who lived there for eight (8) years was forced to move after Defendants raised his rent by $600 per month. This increase occurred only months *after* the RLB issued its decision that the Buildings are subject to rent control. Defendants refused to negotiate the rent increase, forcing this long-term tenant and his family to leave

116. Upon information and belief, Defendants have imposed similar significant rent increases more than those permitted by the Ordinance upon all members of the Class.

**V. Plaintiffs' Leases Include Legally and Factually Incorrect Rent Control Addendums**

117. As part of the 1987 enactment, the New Jersey Legislature included, Section 2A:42-84.3 relating to "Leasing of premises located in exempted multiple dwellings; exemption statement

and notices."

118. In addition to providing notice to the municipality about its exempt status, Section 84.3 also includes an express condition that requires owners to provide notice of a rent control exemption to tenants prior to entering into a lease. *Willow Ridge Apartments, LLC v. Union City Rent Stabilization Board*, Dkt. No. A-3578-20, 2022 WL 2525243, at *2 (N.J. App. Div. July 7, 2022) ("The statute also includes two express conditions that require owners who seek an exemption to provide notice to the municipality and prospective tenants.").

119. The Statute reads:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

120. Portside leases include a "RENT CONTROL ADDENDUM," that purportedly gives notice to all tenants that Portside is exempt from rent control.

121. The Addendum attached to a Portside lease is below:

**RENT CONTROL ADDENDUM**
**(Jersey City, Hoboken and West New York Properties Only)**

This Rent Control Addendum ("Addendum") is dated and effective as of the date on the Residential Lease - Term Sheet (the "Term Sheet") to which this Addendum is attached and made a part of ("the Lease") and is made by and between Lessor and Resident for the Premises at the Community identified in the Lease.

Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

122. This Rent Control Addendum includes a footer suggesting that Defendants have used this version of the Rent Control Addendum since January 1, 2014.

123. While the Rent Control Addendum was disseminated to purportedly comply with the Act, it plainly does not.

124. First, the Rent Control Addendum misrepresents how long any New Jersey rental building can be exempt from local rent control ordinances. The period of exemption does not last "for a period of thirty years following the completion of construction." The exemption period lasts "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less."

125. The Rent Control Addendum also fails to comply with Section 84.3 of the Act because it does not state the "time as may remain in the exemption period."

126. In addition to being wrong on the law, the Rent Control Addendum is wrong on the facts. For example, the addendum provides that Portside is exempt from rent control for thirty years following "completion of construction at the Community."

127. Construction of Portside West was complete at the latest in August 1992 when the Construction Official issued the Certificate of Occupancy. As a result, there is no basis for Defendants to continue claiming exemption from the Ordinance under their legally wrong tenant notice.

128. For a brief period beginning in mid-2022, Defendants amended the Rent Control Addendum to reference the initial mortgage term but then reverted back to using the above-quoted language, which misstates New Jersey law and the facts concerning the Buildings.

## VI. Defendants Prevented Tenants from Discovering their Wrongdoing and the Cause of their Injury

129. Plaintiffs and Class members did not know, and had no reason to know, that

Defendants had been charging and collecting rents in violation of the Ordinance for years.

130. Plaintiffs and Class members first discovered Defendants' unlawful rent charges only after the RLB issued its October 2023 decision.

131. Even through the exercise of reasonable diligence, Plaintiffs and Class members could not have discovered before the RLB's October 2023 decision that Defendants' rents were subject to the Ordinance and had been charged in violation of it.

132. Defendants did not merely remain silent. They took affirmative steps to conceal from Plaintiffs and Class members that their rents were subject to the Ordinance.

133. Since at least 2021, throughout the relevant period dating back to 1994, Defendants included "Rent Control Addendums" with their leases, including addendums substantially similar to the one in Paragraph 121.

134. Through those addendums, Defendants affirmatively represented that Plaintiffs' and Class members' leases were exempt from rent control.

135. Those representations were false and were designed to mislead tenants into believing that the Ordinance did not apply to their units, thereby concealing Defendants' unlawful rent charges.

136. Because of Defendants' affirmative concealment and misrepresentations, Plaintiffs and Class members did not discover, and could not reasonably have discovered, the factual basis for their claims until the RLB issued its October 2023 decision.

137. Defendants' action in collecting illegal rent in violation of the Ordinance is a continuing and repeated violation that occurs every time that a new tenant signs a lease to live at Portside.

## CLASS ACTION ALLEGATIONS

138. Plaintiff brings this action pursuant to Rule 4:32-1, *et seq.*, of the New Jersey Rules of Civil Procedure on behalf of the following Class:

> All current and former tenants of 100 Warren Street and 155 Washington Street who resided in 100 Warren Street and/or 155 Washington Street and who paid rent during the period in which the Buildings were subject to rent control (the "Class").[2]

139. **Numerosity**: The Class is believed to include thousands of both current and former tenants making joinder impracticable. Defendants' records will readily identify both the identities and number of the proposed Class members. Rule 4:32-1(a)(1).

140. **Commonality**: There are numerous common legal and factual questions that apply to the Class (Rule 4:32-1(a)(2)), including but not limited to:

a. Whether Defendants charged and collected rent from Plaintiffs and Class Members that violated the Ordinance;

b. Whether Defendants made false or material misrepresentations to Plaintiffs and Class members regarding the rent control status of the Buildings and the legality of the rents charged;

c. Whether Defendants knew that they made false or material misrepresentations to Plaintiffs and Class members regarding the rent control status of the Buildings and the legality of the rents charged;

d. Whether Defendants submitted false and contradictory Landlord Registration Statements to Jersey City authorities regarding the rent control status of the Buildings;

e. Whether Defendants' conduct violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2;

f. Whether the Defendants' inclusion of the Rent Control Addendum in Plaintiffs' Leases constituted a violation of the New Jersey Truth-in-Consumer Contract,

---

[2] Excluded from the Class are Defendants, their legal representatives, officers, directors, assigns, and successors, counsel of record, or any individual who has or had a controlling interest in Defendants.

Warranty, and Notice Act;

g. Whether Plaintiffs and Class members could have discovered the truth about the Buildings' rent control status and the illegality of the charged rents through the exercise of reasonable diligence;

h. Whether Defendants' conduct caused Plaintiffs and the Class to suffer damages;

i. The appropriate injunctive and related equitable relief for the Class; and

j. The measure and amount of damages incurred by the Class.

141. **Typicality**: Plaintiffs' claims are typical of those of the Class because they arise from the same course of conduct; Defendants' uniform practices of imposing illegal rents on its tenants, Plaintiffs and members of the Class. Rule 4:32-1(a)(3).

142. **Adequacy**: Plaintiff will fairly and adequately protect the Class's interests and has retained counsel experienced in complex and class action litigation. Rule 4:32-1(a)(4).

143. **Predominance/Superiority**: The questions of law and fact common to Class members predominate over any questions which may affect only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, a class action presents far fewer management difficulties, conserves judicial as well as the parties' resources, and protects the rights of each Class Member. Rule 4:32-1(b)(3).

144. **Equitable and Declaratory Relief**: Plaintiffs' request for equitable relief is appropriate because Defendants have acted on grounds generally applicable to the Class, thereby making final equitable or declaratory relief appropriate with respect to the class as a whole. Rule 4:32-1(b)(2).

## CAUSES OF ACTION

### COUNT I
### Violation of the New Jersey Consumer Fraud Act
### (On Behalf of Plaintiffs and the Class)

145. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

146. The New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-2, prohibits, among other things:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

147. The CFA defines the term "sale" to include any "sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." N.J.S.A. § 56:8-1(e).

148. Plaintiffs are "persons" as defined by the CFA as they and all Class members are natural persons as defined therein.

149. Defendants are "persons" as defined by the CFA as they are business entities, corporations, or companies as defined therein.

150. "The CFA acts as an enforcement mechanism for the ordinance and should serve to bring landlords into compliance with the ordinance or be subject to the treble damage and attorney fees sanctions of the CFA." *Wozniak v. Pennella*, 373 N.J. Super. 445, 458, 862 A.2d 539, 547 (App. Div. 2004).

151. New Jersey Courts have consistently held that when a landlord collects or raises rents on tenants in violation of a local rent control ordinance, the landlord is liable for violating the CFA. *See, e.g.*, *Heyert v. Taddese*, 431 N.J. Super. 388, 413, 70 A.3d 680, 696 (App. Div. 2013) (finding violation of local rent control ordinance qualifies as an unconscionable commercial practice under the CFA, because "[i]t is well-established that the broad scope of the CFA encompasses transactions between residential tenants and their landlords."); *Wozniak*, 862 A.2dat 544 (affirming decision finding a violation of NJ CFA, awarding tenant overcharged rent, treble damages, attorney's fees and costs); *Ryan v. Gina Marie, L.L.C.*, 420 N.J. Super. 215, 227, 20 A.3d 442, 449 (App. Div. 2011) (affirming trial court award of treble damages for CFA claim based on landlord's collection of rent in violation of local rent control ordinance).

152. Such liability attaches "even in the absence of an intent to deceive." *Heyert*, 70 A.3d at 696.

153. Defendants are liable to Plaintiffs members of the Class under the CFA for charging and collecting rents in excess of amounts permitted under the Ordinance.

154. In addition to charging excessive and illegal rents, Defendants took the following actions in violation of the CFA:

a. Misrepresenting to tenants and prospective tenants of the Buildings that the Buildings are subject to Jersey City rent control and rent leveling regulations and are not otherwise exempt;

b. Increasing the rents for tenants living in the Buildings in excess of the applicable base rent (inclusive of any lawful increases permitted thereto pursuant to Chapter 260-3(A)), including after the determination by the RLB that the Buildings are not rent control exempt;

c. Utilizing deceptive and non-compliant "Rent Control Addendum" documents in lease agreements as follows:

   i. From 1998 to mid-2022, Defendants' addendum falsely stated that the premises would be exempt from rent control "for a period of thirty years

following the completion of construction at the Community." This language failed to disclose the actual duration of any claimed exemption as required by N.J.S.A. 2A:42-84.3, as it did not account for the possibility of a shorter exemption period based on the duration of the initial mortgage loan.

ii. In mid-2022, Defendants briefly amended the addendum to reference the initial mortgage term but then deliberately reverted to the original, non-compliant language. This bait-and-switch tactic was a calculated attempt to conceal the absence of any valid exemption and induce tenants to pay inflated rents.

d. Continually and flagrantly disregarding the Rent Leveling Board's October 19, 2023 determination by:

iii. Continuing to impose illegal rent increases after being explicitly informed of their non-compliance;

iv. Persisting in violations of the rent control ordinance despite clear notice of its applicability; and,

v. Failing to take any corrective action to bring their practices into compliance with the law.

155. Defendants are liable under the CFA for their unconscionable commercial practices, acts of deception and fraud, and misrepresentations without regard whether they had the intent to deceive, though it is clear that Defendants at times acted with such intent.

156. Defendants intentionally concealed or suppressed material facts with the intent to defraud Plaintiffs and Class members and induce them to:

a. Enter into lease agreements;

b. Pay unlawful rent amounts;

c. Renew leases at inflated rates; and

d. Forgo their rights under rent control laws.

157. Each unconscionable commercial practice, act of deception and fraud, misrepresentation and/or knowing omission/concealment of material fact by Defendants constitutes a separate violation of the CFA.

158. By reason of Defendants' violation of the CFA, Plaintiffs and the proposed Class are entitled to reimbursement of all rental overcharges during the applicable period, treble damages of the overcharged rents, statutory penalties, interest, costs, and reasonable attorneys' fees. *See* N.J.S.A., § 56:8-1, *et seq.*

**COUNT II**
**Violation of the New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act**
**(On behalf of Plaintiffs and the Class)**

159. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

160. Defendants entered into residential leases with the Plaintiffs, which constitute written contracts under the TCCWNA. *Martinez-Santiago v. Public Storage*, 38 F.Supp.3d 500, 512 (D.N.J.,2014).

161. First, Defendant's violated the TCCWNA by engaging in conduct that violates the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2 by deceptively disclaiming that the Buildings were exempt from rent control, when they otherwise were not. Plaintiffs and the Class clearly established legal right to contract free from deceptive practices was violated.

162. Second, at the time that the Plaintiffs signed their leases with Defendants, the leases contained provisions that violate Plaintiffs' clearly established legal rights.

163. Specifically, the Rent Control Addendum included in all of Plaintiffs' Leases provides as follows:

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

164. The Rent Control Addendum is a clear violation of Plaintiffs' rights because it is contrary to New Jersey law in two respects.

165. First, as discussed above, it misstates the law, because the Buildings are in fact subject to the Ordinance.

166. Second, the Rent Control Addendum fails to comply with the Act. N.J.S.A. 2A:42-84.3 provides that the owner of a dwelling claiming exemption from rent control shall provide the prospective tenant with a statement that the apartment "is exempt from rent control or rent leveling for such time as may remain in the exemption period." (emphasis added).

167. The Rent Control Addendums never provided Plaintiffs and members of the Class with this important information.

168. Plaintiffs are aggrieved consumers because they suffered ascertainable losses as a result of Defendants' conduct.

169. As a direct result of Defendants misrepresentations in the Leases concerning Plaintiffs' clearly established rights under New Jersey law, Plaintiffs have suffered harm in the form of paying excess rent and Defendants are liable to Plaintiffs for actual damages, and/or statutory penalties, attorney's fees, and costs.

**COUNT III**
**Breach of Contract**
**(On behalf of Plaintiffs and the Class)**

170. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

171. Plaintiffs and the Class entered into leases with Defendants for purposes of renting apartments in the Buildings.

172. The leases contain or contained Rent Control Addendums, stating that "the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City . . . and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community."

173. Defendants breached the Leases because the Rent Control Addendum is materially false; the "Premises and Community" are not and have never been exempt from rent control, rent stabilization or rent leveling ordinances.

174. Plaintiffs and the Class have suffered damages as a result of Defendants' breach in the form of paying illegally inflated rents and illegally increased rents.

**WHEREFORE,** Plaintiffs, individually and on behalf of the proposed Class, demand judgment against Defendants as follows:

A. Certifying this action as a class action pursuant to Rule 4:32 of the New Jersey Rules of Court;

B. Appointing Plaintiffs Rita Botelho, DaShawn Petyon, and Michael Shanahan as Class Representatives;

C. Appointing Plaintiffs' counsel as counsel for the Class;

D. Awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

E. Awarding punitive damages to the fullest extent permitted by law;

F. Awarding attorneys' fees, costs, and expenses to the extent permitted by law;

G. Awarding pre-judgment and post-judgment interest as provided by law;

H. Entering judgment declaring that Defendants' conduct violated the laws cited herein;

I. Ordering that Defendants comply with the Ordinance for all current and future tenants;

J. Voiding all unlawful terms in the proposed Class members' leases with Defendants;

K. Granting such other and further relief as the Court deems just and equitable; and

L. A declaration that Defendants' actions violated the laws cited herein.

Respectfully submitted,

Dated: April 10, 2026

By: *s/Simon B. Paris*

Simon Bahne Paris (NJ ID #04982-1996)
Patrick Howard (NJ ID #02280-2001)
Joshua D. Snyder (NJ ID #02390-2001)
Benjamin J. Eichel (NJ ID #31779-2019)
**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
8000 Sagemore Drive, Suite 8303
Marlton, NJ 08053

1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 575-3985
Facsimile: (215) 496-0999
Email: sparis@smbb.com
phoward@smbb.com
jsnyder@smbb.com
beichel@smbb.com

Eric J. Nemeth, Esq.
**ERIC J. NEMETH, P.C.**
55 Madison Avenue,
Suite 400
Morristown, NJ 07960
enemeth@ejcounsel.com

Neil D. Marotta, Esq.
**MAROTTA & GARVEY**
NJ Attorney ID No. 024781992
3916 Bergenline Avenue,
Suite 2200
Union City, NJ 07087
mglawyers@aol.com

*Attorneys for Plaintiffs and the Proposed Class*

**NOTICE TO ATTORNEY GENERAL OF ACTION**

Pursuant to N.J.S.A. § 56:8-20, a copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within 10 days after filing with the Court.

Dated: April 10, 2026

Respectfully submitted,

By: *s/Simon B. Paris*

Simon Bahne Paris (NJ ID #04982-1996)
Patrick Howard (NJ ID #02280-2001)
Joshua D. Snyder (NJ ID #02390-2001)
Benjamin J. Eichel (NJ ID #31779-2019)
**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
8000 Sagemore Drive, Suite 8303
Marlton, NJ 08053

1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 575-3985
Facsimile: (215) 496-0999
Email: sparis@smbb.com
phoward@smbb.com
jsnyder@smbb.com
beichel@smbb.com

# EXHIBIT A





# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
**Division of Housing Preservation**
**Office of Landlord/Tenant Relations**

**Steven M. Fulop**
**Mayor**

**342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305**
**PHONE: (201) 547-5127**


November 3, 2023

**Via Email and Regular Mail**

For the Tenants

Neil Marotta, Esq.
Marotta & Garvey Attorneys at Law
3916 Bergenline Ave., Ste. 2200
Union City, NJ 07087
Email: mgclawyers@aol.com>

For the Property Owner

Derek Reed, Esq.
Ehrlich, Petriello, Gudin, Plaza & Reed, P.C.
60 Park Place, Suite 1016
Newark, NJ 07102
Email: dreed@epgprlaw.com>

Re: Rent Leveling Board Decision

Dear Mr. Reed and Mr. Marotta,

The Rent Leveling Board conducted a meeting on October 19, 2023, in compliance with the Sunshine Law in order to hear the above-referenced matter. Commissioners Hill, Hamilton, Isikoff, S. Johnson, and Pinchinat were present, with Chairman Cupo presiding.

Preliminary Statement

Beginning in June 2022, the Jersey City Office of Landlord/Tenant Relations Bureau of Rent

Leveling (the "Bureau") received Illegal Rent Petitions from numerous tenants residing at 100 Warren Street and 155 Washington Street (hereinafter, "Tenants"). The many Illegal Rent Petitions were combined by the Bureau into one determination for each building. While the two cases remain separate on appeal, many of the facts surrounding the appeal are interwoven. This determination, and the general background regarding the construction and eventual rental of the buildings, as well as a discussion of the legal issues pertaining to the voluminous number of petitions, are combined herein.

In the Illegal Rent Petitions, the Tenants sought a determination from the Bureau as to whether the rent increases for their apartments complied with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code. In particular, the Tenants challenged whether the buildings were exempt from the Jersey City Rent Control Ordinance, as codified in Chapter 260 of the Jersey City Municipal Code. In essence, the Tenants claim that the Property Owner did not qualify for the exemption and that, even if the Property Owner did qualify for the exemption, it failed to perform the required tasks to avail itself of the exemption. In the alternative, they argue that the exemption, if it ever applied, has lapsed, or been forfeited, by subsequent actions.

Initial Determination and Appeal

In response to the Illegal Rent Petitions, the Property Owner, Portside Urban Renewal LLC, c/o Equity Residential Management, LLC, provided via counsel a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements, along with several documents, including most notably copies of Certificates of Occupancy for the buildings and a "Letter of Exemption" dated November 23, 1994.

On September 19, 2022, the Rent Leveling Administrator issued Bureau Determinations for both 100 Warren and 155 Washington. With respect to 100 Warren, the Bureau found that rents prior to August 24, 2022 were not governed by the City's rent control regulations because the Property Owner had complied with the requirements of the State's new construction exemption to rent control. The Bureau found that the 30-year exemption expired on August 24, 2022, and that therefore 100 Warren was subject to rent control from that point forward.

With respect to 155 Washington, the Bureau found that "155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents."

The Tenants were then permitted additional time to submit documents to the Bureau for

consideration of the issue of a mortgage which the Tenants argued would limit the exemption to the length of that mortgage, rather than thirty years. The Bureau reviewed the documents submitted and, in supplemental Determinations issued on December 15, 2022, found them unavailing. As such, the initial Determinations remained in place.

Following an extension of time to appeal, the Tenants appealed the Determinations (including the supplemental Determinations) to the Jersey City Rent Leveling Board on January 25, 2023. Following an agreed-upon schedule, the parties submitted their written briefs and related submissions in advance of a hearing date.

The Board heard the tenants' appeal on May 31, 2023. The tenants were represented by Neil Marrota, Esq., of Marotta & Garvey. The property owner was represented by Derek Reed, Esq., of Ehrlich, Petriello, Gudin, Plaza & Reed, PLLC. Appellant Kevin Weller testified on behalf of all Tenants.

At the conclusion of the May 31, 2023, hearing, the Board closed the public portion of the cases and voted to adjourn while reserving its determination. Shortly thereafter, the parties jointly contacted the Board via the Jersey City Law Department to request an adjournment of the cases to permit the parties to attempt to resolve the matters via mediation. The Board granted the joint adjournment request. In September 2023, the parties informed the Board that they wished to place the cases back on the Board's agenda. The cases were heard once more on October 19, 2023, at which time the Board members provided their reasoning and made a motion to find in favor of the Tenants, holding that the exemption claimed by the Property Owner was not properly filed and remanding the case to the Bureau for adjustment of the Tenants' rents. The motion was seconded and adopted unanimously.

## Factual Background

100 Warren and 155 Washington are two separate multiple dwellings forming the single apartment community known as Portside Towers. Brief of Property Owner ("PO"), at 1. The original owners of the property financed the new construction with the intention of developing a condominium project. PO, at 1-2. 100 Warren was constructed first, and a Certificate of Occupancy was issued on August 25, 1992. PO, at 2. The project eventually went through foreclosure and was unoccupied between the time of the issuance of the Certificate of Occupancy and a Sheriff's Sale on November 23, 1994, at which time the current owner took possession. PO, at 2.

The same day that it acquired the property, the current Property Owner abandoned the condominium plan and resolved to convert the development to a multiple dwelling residential

apartment complex. PO, at 2. To that end, the current owner provided a letter dated November 23, 1994, and addressed to Michael J. Regan, who was then the Construction Code Official for the City of Jersey City. The letter states, in pertinent part:

> Portside Apartments Urban Renewal Partners, L.P. is the owner of 1 Washington Street (a/k/a 100 Warren Street), Jersey City, New Jersey (Lot 34, Block 60), which is a newly constructed multiple dwelling containing 229 rental dwelling units. We are hereby claiming exemption from rent controls under Article XX (Multiple Dwelling Rent Controls_ of the Jersey City Code and any form of future rent control pursuant to N.J.S.A. 2A:42-84.1 et. seq. The period for which exemption is claimed for the 229 units in this building shall commence on the anticipated date of initial occupancy, January 1, 1995.
>
> This written statement is being made pursuant to the requirements of N.J.S.A. 2A:41-84.4.

On December 6, 1994, the Jersey City Construction Official responded to the November 23, 1994 letter. The City acknowledged receipt, but also wrote

> Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility.
>
> See 100 Warren Determination, at 4.

No letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been produced by the City or any party. See 155 Washington Determination, at 4.

On January 24, 1995, a Certificate of Continued Occupancy was issued for 100 Warren. PO, at 2. Construction of 155 Washington was completed on or about December 31, 1997, and a Certificate of Occupancy was issued on that date. Ibid.

100 Warren and 155 Washington operated as exempt from Jersey City's rent control regulations from the date of initial occupancy through the filing of the instant Illegal Rent Petitions. PO, at 2.

## Legal Standards

Chapter §260-3 of the Jersey City Municipal Code provides multiple dwellings as defined therein containing five or more residential housing spaces are subject to the City's rent regulations. It is

undisputed that both buildings are multiple dwellings with more than five units and are presumed to be rent controlled.

However, the City's ordinance contains several exemptions to the rent restrictions contained in Chapter 260. Pertinent to these cases is an exemption provided by New Jersey State law via N.J.S.A. 2A:42-84.1 et seq.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute"). As currently amended, the exemption provides as follows:

> a. In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance, other than under the authority of P.L.1966, c.168 (C.2A:42-74 et seq.), those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units shall not apply to multiple dwellings constructed after the effective date of this act, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.
>
> b. In the event that there is no initial mortgage financing, the period of exemption from a rent control or rent leveling ordinance shall be 30 years from the completion of construction.

The State exemption is incorporated in §260-6C of the Municipal Code:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

As noted in the Bureau's determinations, the exemption was initially limited in time, but has since been extended indefinitely. See N.J.S.A. 2A:42-84.5b ("Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56.") The stated reason for the permanence of the exemption is that "[t]he Legislature deems it to be

necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." Ibid.

As referenced in the Municipal Code, the Statute contains both a notice requirement to tenants, contained in N.J.S.A. 2A:42-84.3, and a notice requirement to the municipality via its construction official, codified in N.J.S.A. 2A:42-84.4. Those requirements read as follows:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.
>
> . . .
>
> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

## Rent Leveling Board's Analysis

As an initial matter, the Board must consider whether the Property Owner satisfied the two notice requirements to avail itself of the "new construction" exemption contemplated by N.J.S.A. 2A:42-84.4. The earlier notice requirement must be presented to the municipality's Construction Official. The Property Owner "shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption." N.J.S.A. 2A:42-84.4.

The second notice requirement states that the Property Owner "shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the

prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period." N.J.S.A. 2A:42-84.3. Each lease and lease renewal must contain this notice. Ibid.

As it relates to notice to the construction official, the Bureau found that the Property Owner sent the aforementioned letter on November 23, 1994, to the Jersey City Construction Code Official, in which the Property Owner claimed the exemption for 100 Warren only. The Letter of Exemption stated that the exemption "shall commence on the anticipated date of initial occupancy, January 1, 1995." See 155 Washington Determination, at 4. The initial certificate of occupancy for the building was issued on August 25, 1992, but due to the failure of the condominium development plan, there had been no initial occupancy between that time and the foreclosure and subsequent Sheriff's sale. See 100 Warren Determination, at 3; PO, at 2.

However, the Statute requires that the Property Owner file for the exemption "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." Here, the certificate of occupancy was issued in August 1992, though the new construction contemplated the sale of condominium units, not apartment rentals. The Bureau found that the Letter of Exemption was sufficient because it meets the purposes of the notice to the Construction Official; namely, that the building has been constructed completely and is a multiple dwelling. However, because the letter claiming the exemption was not filed before the certificate of occupancy for the "new construction" at 100 Warren in 1992, the Rent Leveling Board finds that the Property Owner could not timely avail itself of the exemption. See Jersey City Rent Leveling Board October 19, 2023 Hearing Transcript ("October 19 Hearing"), at 19. The Property Owner argues that the Bureau's determination was sound because the Letter of Exemption for 100 Warren was filed "more than thirty (30) days before the initial occupancy." PO, at 4. The Statute does require notice to the tenants to be provided prior to occupancy and contained in each lease, but it requires notice to the Construction Official to be provided before the issuance of a certificate of occupancy. That did not happen here. As such, the Board rules in favor of the Tenants on this issue, finding that the building at 100 Warren had not availed itself of the thirty-year statutory exemption for new construction. See October 19 Hearing, at 24.

With regard to the lack of a letter seeking the exemption for 155 Washington, the Bureau concluded that

> Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not. It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent. Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency. What is clear, as set forth in

detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.

That the Property Owner was clearly aware of the requirement to file the notice and failed to do so does not weigh in its favor, notwithstanding the Construction Official's admittedly confusing response to the Letter of Exemption. The Statute's notice requirement is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms. There is no dispute that as it relates to 155 Washington that the record is devoid of any evidence of compliance with the notice requirement. While the Portside Towers community is managed "as one development," the Statute also requires that the letter contain "a statement of the date upon which the exemption period so claimed shall commence and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed." The address and units referenced in the earlier Letter of Exemption refer only to 100 Warren and, therefore, cannot be applied to the second building or any of its units.

With only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at 155 Washington are not exempt from the City's rent control ordinance. See October 19 Hearing, at 19, 24.

Because the Board finds that the Property Owner has not satisfied the requirements of N.J.S.A. 2A:42-84.4, which must be satisfied before the notice to tenants is relevant, the Board declines to rule on the sufficiency of the notices to tenants and allegedly misfiled or inaccurate rent registration statements filed with the Bureau. Moreover, the Board need not opine on the limitations of the mortgage documents which Tenants allege would limit the length of the exemption should it apply to either building.

The Bureau's determination set forth the legislative purpose of the exemption, which is "to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." See 100 Warren Determination, at 2. The Property Owner concurred in its briefs and at the Board hearing that the Bureau's decision gave effect to the purpose of the Statute. PO, at 11. Notwithstanding the stated goals of the Statute, the notice requirements also have purpose; namely, to allow the municipality's construction official to inspect the subject property and to evaluate whether it qualifies for the exemption. The Bureau's determination would allow a property owner to skirt that obligation and proceed as it if were a voluntary step in the process. Furthermore, the requirements for timely notice both to the municipality and the tenant allows the parties affected by the exemption to have notice regarding the status of the properties and track which properties are subject to, and exempt from, rent control. In this case, because the City and Tenants did not have a record of the exemption or its potential expiration, there was no record of when the

exemption would expire. That lack of knowledge required a determination for the first time by the Bureau that the exemption for 100 Warren had expired on August 24, 2022. See 100 Warren Determination, at 6.

Finally, the Bureau of Rent Leveling is empowered to "remedy violations of [Chapter 260] by adjusting rentals, ordering rebates and bringing appropriate legal charges." §260-9(A)(1). Here, the Board's decision is that there was no valid exemption for the duration of the tenancies of both buildings. See October 19 Hearing, at 24. The Board's decision affects all tenants in all units of the two buildings, and the Bureau is empowered to apply this decision to all units in both buildings from the date of the first illegal rent petition at issue here in each building. Id., at 23-24.

## Rent Leveling Board Decision

The Board unanimously concludes that due to the failure by the Property Owner and its predecessor to comply with the notice requirement in N.J.S.A. 2A:42-84.4, both buildings and all units therein are and have been for the duration of their occupancies subject to rent control.

To summarize, because the Letter of Exemption to the Construction Official in November 1994 was provided to the City after the issuance of the certificate of occupancy for that building, it was not filed timely under the Statute. Further, because it is undisputed that no evidence of a filing for 155 Washington has been produced, the Board finds that 155 Washington is also subject to rent control.

The Statute does not expressly provide for a remedy where an exemption is inaccurately assumed by the municipality and/or property owner; however, the Board finds that there was no valid exemption from the beginning of the occupancy of the units. Any interpretation to the contrary would render the notice provisions voluntary or mere surplusage, whereas the Statute provides that the property owner "shall" provide the required notice in order to obtain the exemption.

The Bureau's policy is to provide a "lookback window" of six years for illegal rent petitions, coinciding with the statute of limitations for a cause of action for breach of contract. The Board understands this is a matter of both policy and practicality for the Bureau, which has limitations relating to recordkeeping and equitable considerations which militate toward finding a reasonable window of time for which adjustments to rent should be made following a successful illegal rent petition. As such, the Board adopts the Bureau's lookback policy and instructs the Bureau to adjust the rents for all units in each building to comply with the City's rent control regulations going back six years from the date of the first petition for each building; namely, June 25, 2022, for 100 Warren, and July 27, 2022, for 155 Washington.

Conclusion

The Property Owner did not fulfill its obligations to obtain an exemption from Chapter 260 of the City's Code, and, for the reasons set forth on the record and in this determination, both 100 Warren and 155 Washington are subject to Jersey City rent control regulations. The Bureau is instructed to obtain the records necessary to review and adjust the rent on all units within the buildings dating back six years from the filing of the first Illegal Rent Petition at issue in the instant matters for each building.

The Landlord or the Tenant may appeal the findings of any decision of the Rent Leveling Board by "action in lieu of prerogative writ" to a court of competent jurisdiction filed within 45 days of the Board's decision, as provided by New Jersey Rule of Court 4:69.

This is to certify that this constitutes the decision of the Jersey City Rent Leveling Board in connection with this matter.

Very truly yours,

Al Cupo
Chair, Jersey City Rent Leveling Board

CC: Tenants

# Civil Case Information Statement

## Case Details: HUDSON | Civil Part Docket# L-001490-26

**Case Caption:** BOTELHO RITA VS THE TOWERS AT PORTSI DE URBAN
**Case Initiation Date:** 04/10/2026
**Attorney Name:** SIMON BAHNE PARIS
**Firm Name:** SALTZ MONGELUZZI ET AL.
**Address:** ONE LIBERTY PL 52ND FL 1650 MARKET ST PHILADELPHIA PA 19103
**Phone:** 2154968282
**Name of Party:** PLAINTIFF : RITA BOTELHO
**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** OTHER Class Action - Consumer Fraud
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 12 JURORS
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO
**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: RITA BOTELHO? NO**

**Are sexual abuse claims alleged by: DASHAWN PEYTON? NO**

**Are sexual abuse claims alleged by: MICHAEL SHANAHAN? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

**CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION**

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES **Title 59?** NO **Consumer Fraud?** YES **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

04/10/2026
Dated

/s/ SIMON BAHNE PARIS
Signed

# SUMMONS

Attorney(s) Simon B. Paris
Office Address Salta Mongeluzzi Bendesky PC
Town, State, Zip Code 8000 Sagamore Dr., Suite 8303
Marlton, NJ 08053

Telephone Number 215-575-3985
Attorney(s) for Plaintiff R. Botelho, D. Peyton, M. Shanahan

Rita Botelho, Dashawn Peyton, and
Michael Shanahan
Plaintiff(s)

vs.

The Towers at Portside Urban Renewal
Equity Residential Management, LLC
Defendant(s)

**Superior Court of New Jersey**

Hudson County
Civil Division
Docket No: HUD-L-001490-26

**CIVIL ACTION SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Simon B. Paris
for Michelle Smith
Clerk of the Superior Court

DATED: ______________

Name of Defendant to Be Served: The Towers at Portside Urban Renewal Company, LLC

Address of Defendant to Be Served: ______________

# SUMMONS

Attorney(s) Simon B. Paris
Office Address Salta Mongeluzzi Bendesky PC
Town, State, Zip Code 8000 Sagamore Dr., Suite 8303
Marlton, NJ 08053
Telephone Number 215-575-3985
Attorney(s) for Plaintiff R. Botelho, D. Peyton, M. Shanahan

Rita Botelho, Dashawn Peyton, and
Michael Shanahan
Plaintiff(s)

vs.

The Towers at Portside Urban Renewal
Equity Residential Management, LLC
Defendant(s)

**Superior Court of New Jersey**

Hudson County
Civil Division
Docket No: HUD-L-001490-26

**CIVIL ACTION SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Simon B. Paris
for Michelle Smith
Clerk of the Superior Court

DATED: ________________

Name of Defendant to Be Served: The Towers at Portside Urban Renewal Company, LLC

Address of Defendant to Be Served: ________________